UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,      CR. NO. 21-20756
v.             Hon. Judith E. Levy

JAMAR LEE-STINSON

    Defendant.
_____/

# JAMAR LEE-STINSON'S SENTENCING MEMORANDUM IN SUPPORT OF A JUST SENTENCE

At just 19, Mr. Jamar Lee-Stinson has experienced more trauma than any lifetime should entail. He is the survivor of cruel physical abuse and neglect by the very hands that fathered him. He has been left to fend for himself as a child in a home without electricity. He has seen friends killed. He has seen a lifeless body. For Jamar, his life is best described by the Zulu adage: A person becomes a person through other people. Jamar is a product of his environment. He is the product of neglect by those systems supposed to protect and care for him. He needs trauma counseling. He needs substance abuse rehabilitation. He needs a way to address and relieve his tortured existence without substance abuse. The advisory sentencing guidelines suggest an imprisonment range of 57-71 months. The Court should consider not more than 48 months, a sentence that would be just and would fulfill the "overarching" command of §3553:

that a sentence be "sufficient, but not greater than necessary" to fulfill the purposes of sentencing set out in the statute.[1]

For the reasons set forth below, Mr. Lee-Stinson respectfully requests the Court impose a reasonable sentence within the advisory range pursuant to 18 U.S.C. § 3553, of 48 months.

1. **The Law**

In *U.S. v. Booker*, the Supreme Court rendered guideline imprisonment ranges no more than "effectively advisory."[2] Sentencing courts are still required to consider the guideline imprisonment ranges, but are free to "tailor the sentence in light of other statutory concerns as well," and are to consider all information concerning the background, character and conduct of a defendant.[3] *Booker* thus returns substantial discretion to a court in imposing a reasonable sentence under the circumstances, guided by the overarching goal to "impose a sentence sufficient, but not greater than necessary."[4] Section 3553(a) lays out the required considerations of the sentencing court:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal

---

[1] 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).
[2] *United States v. Booker*, 543 U.S. 220, 245 (2005).
[3] *Id. See also* 18 U.S.C. § 3553(a).
[4] 18 U.S.C. § 3553(a).

conduct; (C) to protect the public from further crimes of the defendant . . .
(3) the kinds of sentences available [and] . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . ."[5]

In reaching this decision, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence, as explained by the District Court in *United States Faison*, 2020 wl 815699, at *1 (D. Md. Feb. 18, 2020) (Hazel,J.):

> During the sentencing hearing, the lawyers and the judges discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month, and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his young child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.

2. **The 3553(a) factors support a probated sentence**

    a. **History and Characteristics of the William Lee-Stinson**

In so many ways, Jamar Lee-Stinson never stood a chance at a normal life. Jamar was born to Shade Lee and Tomar Lee-Stinson. At the time of his birth, Shade was just

---

[5] *Id.*

17, and Tomar 19 years old. Both parents struggled with substance abuse. His father was addicted to crack cocaine, and his mother was addicted to alcohol and marijuana. His parents separated around the time of his birth, at least in part due to Tomar's anger issues.

Jamar was "raised" by both parents, but the reality is that he was raised by neither. While both parents were separately involved in his upbringing, it is unfortunate to say that their influence was a net negative. The earliest known CPS reports date to January of 2005, when Jamar was not even two years old. (Ex. A, CPS report from March 2017) Jamar's teenage parents were not caring for him and not going to school, and the other adults living in the home were smoking marijuana and selling drugs. The children were found to be hungry, and the house dirty. (*Id.*)

In May of 2008, when Jamar was just 5 years old, another CPS investigation found physical neglect where Shade Lee was drinking and smoking marijuana while caring for the children. (*Id.*) The home was littered with piles of garbage, and the children were found not to have food, were found not to have been bathing, and were found to be going to school only half of the time. (*Id.*) Neglect and food insecurity were just part of Jamar's "normal."

Jamar recounted to undersigned counsel a story from when he was about 7 years old. At the time, he and his brother Ja'Carie, aged 4 at the time, were in the custody of his mother, Shade Lee. Jamar's mother decided to leave them home for about two weeks in a house with no electricity. Jamar, at just age 7, was responsible for caring for

himself and his brother. Jamal fixed bicycles and stood outside of grocery stores helping people put away groceries for change. With whatever he could scrounge, he would buy cases of juice for he and his brother from the local Dollar Tree. For hot food, he would buy for himself and his brother some chili cheese fries from a coney island restaurant. He and his brother survived this way for about two weeks before Jamar's aunt, Monae Lee, discovered their living conditions and came to provide them food and proper shelter.

Incidents like this were the reason why Shade Lee was stripped of her parental rights in August of 2012. With that, Jamar and his brother were separated, with Jamar left in the hands of his abusive and drug addicted father, Tomar Stinson.

Life with Tomar was not easy. According to one CPS report from June of 2015, authorities were called because Tomar reportedly body slammed 11-year-old Jamar on the floor on their family home. (Ex. B, CPS records from June 2015) He then grabbed Jamar off the floor, carried him outside and again body slammed him on the grass. He then began striking Jamar in the chest, approximately 4 to 6 times. The reason for this abuse? Jamar was being "hard headed." (*Id.* at Page 14.)

Tomar knew how to get away with this conduct without alerting CPS. Anytime CPS were investigating a new claim of abuse or neglect, Tomar would threaten the children: *Say anything, and you'll be taken away from your families. You'll be put in group homes and you'll never see any of us again.* The threats were enough to keep the children from ever admitting to CPS that abuse was occurring. As a result, CPS rarely ever found a

5

preponderance of evidence of abuse or neglect, despite repeated calls and investigations.

In another CPS report, Jamar had reportedly admitted to a concerned adult that he'd found drugs in their basement, as well as a sawed-off shotgun underneath his father's bed. (Ex C, CPS Record from Feb. 2016) But as usual, all of Tomar's children—Jamar included—ultimately shared the same script and denied any abuse or neglect by their father. Tomar had no sympathy for his children. When the school of Jamar's sister found a suicide note written by his daughter, Tomar reportedly replied, "I'm sick of this bullshit, I can't deal with this right now, if you call CPS, I'm pulling her out of school," and hung up the phone (*Id.* at 5.)

When Tomar was not abusing his children, he was neglecting them. Jamar recounted to undersigned counsel a terrifying story of neglect, where Tomar came into $22,000 from his father's passing, and used that money to go on a gambling and crack binge. He took the kids, and they would hop from one casino hotel room to another while their father gambled and used crack. Unfortunately, this incident was corroborated by the CPS records, which allege:

> Last week, Tamar got $22,000 from his father passing away. He left Tarisha's home with the children because he did not want to have to give Tarisha any money. The children had been staying with Tarisha for two years and it was the best thing for them. Now the family has been house hopping and staying in hotels. The children's mother, Shade, has also come back in to the picture. It is unknown where the family is currently staying.
>
> Tamar, Shade, and Shade's mother leave the children by themselves wherever they are staying and then they go to hotels to use crack. The children also go with them to hotels and see their parents using crack. It is unknown how much Makayla has witnessed when she

> **is with her father. Shadiamond has been around drugs her whole life. The parents are leaving the crack out where the children would have access to it. Shadiamond called Tarisha yesterday and asked to come to her home because her parents are using drugs. Tamar will not take the children back to Tarisha's home. It is unknown how the children are eating while their parents are getting high.**

(Ex. D, CPS Record from July 28, 2016) At the time of the CPS report, the children hadn't seen their father for a month.

In December of 2016, CPS was again called out because Tomar, who still had physical custody of his children, had abandoned them for about four months. (Ex. E, CPS Record from Dec. 2016) He left the kids with Shade, their mother, who had been stripped of custody due to her own inability to care for the children. The abandonment expectedly turned out to be a disaster. When winter break was over, the children were supposed to return to school, but missed the first two weeks because they did not have jackets or any other appropriate clothing to wear. During this investigation, Jamar reported again that he had not seen his father in months, that his dad was not stable and had witnessed him using drugs, and that he witnessed firearms and knives in the home with their father. After an interview with Tomar, he admitted that he couldn't care for the children, and agreed to put in a safety plan where the kids would live with their grandmother. Per usual, the investigators found no preponderance for neglect by the father.

In March 2017, CPS was again contacted because Jamar was living with relatives who weren't his parents. (Ex. A, CPS records from March 2017) This time he was living with Tarisha Kegler, his parental aunt. Jamar reported issues with his uncle. When he

got home the previous Sunday, his uncle Jermaine was high. Jermaine accused Jamar of stealing his marijuana, threatened to kill him, and forced him out of the home. An off-duty police officer found 15-year old Jamar crying alone at a nearby liquor store. He took Jamar to a local police station. Jamar had not eaten anything that day.

When CPS reached out to Tomar, who still retained full custody of the children, they were greeted with hostility.[6] Despite not having seen his children for nearly a year, he did not understand why CPS was getting involved, and refused to sign his parental rights away to Tarisha Kegler or to Jamar's other aunt, Monae.

It is little surprise that, as a result of this constant neglect and abuse by his parents, Jamar developed some behavioral issues. He was admitted to the Detroit Behavioral Institute for some time beginning December 2019 to receive medication and therapy. While at the Detroit Behavioral Institute ("DBI"), Jamar "appeared guarded at times but overall displayed a willingness to engage in programming and therapy." (Ex. F, DBI records) While at DBI, he was also enrolled in the Capstone Academy, a way to advance his education while in treatment. By the week of February of 2020, Jamar's Capstone Academy grades were the following:

Algebra II: B-
Art Design: B
ELA III: A
Government: A-

---

[6] Ex. A, at Page 6. ("Mr. Stinson was very hostile. Mr. Stinson was yelling and cussing. Mr. Stinson reported his children are where they need to be and he does not understand why CPS keeps getting involved. Mr. Stinson reported that he is not signing his rights away.")

Life Skills: A
Physical Education/Health: P
Physics B: B

(Ex. B, at Page 9)

Jamar found stability and useful treatment while at the DBI, but he was released from DBI earlier than expected due to his good behavior. From there, he returned to living with his Aunt Monae. Jamar would eventually graduate from the Michigan International Preparatory School.

Between 2017 and 2021, Jamar rarely lived at any one location for more than a couple months. He was shuffled between his aunt Monae Lee, this parental aunt Tarisha Kegler, his paternal cousin Orlando May; between group homes like the Wolverine Center, Capstone Academy, Delaware Home, and the Children's Center in Wayne County; and time in juvenile detention.

**Section: Placement**
**(1) JAMAR CALVIN LEE-STINSON:**
**Placement History:**

| Provider | Living Arrangement | Begin Date | End Date |
|---|---|---|---|
| CHILDREN'S CENTER WAYNE CO | Rental Home/Apartment | 06/10/2020 | |
| Lee Monay R | Licensed/Unlicensed Relative Home | 06/04/2020 | 06/10/2020 |
| DETROIT CAPSTONE | Child Caring Institution | 11/25/2019 | 06/04/2020 |
| WAYNE COUNTY JUVENILE DETENTION | Detention | 10/18/2019 | 11/25/2019 |
| DELEWARE HOME | Child Caring Institution | 07/02/2019 | 10/18/2019 |
| | AWOL | 05/13/2019 | 07/02/2019 |
| DETROIT CAPSTONE ACADEMY - NORTH CAMPUS | Child Caring Institution | 05/01/2019 | 05/13/2019 |
| | AWOL | 03/08/2019 | 05/01/2019 |
| May Orlando D | Licensed/Unlicensed Relative Home | 01/19/2019 | 03/08/2019 |
| Wayne Co. Juvenile Detention | Jail | 12/17/2018 | 01/19/2019 |
| May Orlando D | Licensed/Unlicensed Relative Home | 07/20/2018 | 12/17/2018 |
| | AWOL | 05/17/2018 | 07/20/2018 |
| WOLVERINE CENTER | Emergency Residential Shelter | 04/30/2018 | 05/17/2018 |
| Kegler Tarisha | Licensed/Unlicensed Relative Home | 01/26/2018 | 04/30/2018 |
| | AWOL | 01/15/2018 | 01/26/2018 |
| Lee Monay R | Licensed/Unlicensed Relative Home | 06/20/2017 | 01/15/2018 |

(Ex. G, CPS Report from Sept. 25, 2020) It is safe to state that Jamar has lived with little food stability, housing stability, or financial stability.

Apart from his struggles finding stability in his life at home, Jamar found the streets equally difficult. Jamar comes from an impoverished part of Detroit, where the ubiquity of crime and violence can only serve to desensitize its community. Jamar was young when he walked in on a dead body, a friend's uncle that had shot himself while Jamar and his friend were in another room of the house. Before that, Jamar had witnessed a childhood friend die after being hit and dragged by a car.

It is no wonder then, that Jamar has struggled with addiction to controlled substances. He was only 12 or 13 when he first started using marijuana. He later transitioned to opiates and pain medication. He also regularly consumed cough syrup, all with the hope of numbing the trauma, if only for a fleeting moment. Jamar recognizes that he needs help. He wants substance abuse rehabilitation. He wants an opportunity to change the direction that his life is headed.

Undersigned counsel does not stress Jamar's personal characteristics to garner sympathy or pity, but to provide a context for why Jamar engaged in risky and impulsive behavior. Jamar has had so little stability that he has had to operate his entire existence in a state of "fight or flight." It is hard to imagine any individual enduring what Jamar has endured and coming out unscathed. Poverty drives violent crime. David Calnitsky and Pilar Gonalons-Pons, *The Impact of an Experimental Guaranteed Income on Crime and*

10

*Violence*, Univerity of Pennsylvana Scholarly Commons, https://perma.cc/YS5Y-NKCA. Unfortunately, poverty is all Jamar has ever known.

For similar reasons, the Court should also acknowledge Lee-Stinson's age at the time of the offense. The Supreme Court has acknowledged "what 'any parent knows'" and what research has shown time and time again: juveniles and young adults are different.[7] "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control."[8] Specifically, the prefrontal cortex of the brain does not reach "full adult maturity" until "the early to mid-20s," and this part of the brain controls impulse control, complex decision-making, inhibition, and planning. (Ex. H, Keating Summ., at 3.) This is why young people have a difficult time adjusting risky behavior after they have begun. (*Id.* at 3-4.) The immature brain and hormonal balances lead young people "to focus more on the benefits of risky behavior than on the possible negative consequences of their actions." (*Id.* at 5.)

For these reasons, the Supreme Court acknowledged young people lack maturity and have "an undeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk taking."[9] They are also "more vulnerable to negative influences and outside pressures, including from their family and peers."[10] Critically, their characters

---

[7] *Miller v. Alabama*, 567 U.S. 460, 471 (2012).
[8] *Id.* at 471-72 (cleaned up).
[9] *Id.* at 471 (cleaned up).
[10] *Id.* (cleaned up).

11

are "not as well formed as an adult's" because their "traits are less fixed and [their] actions less likely to be evidence of irretrievable depravity."[11]

In short, although the law treats Lee-Stinson as an adult at the time of his offenses because was nearly 18 years old, there is a compelling, evidence-based argument to change our approach to criminal conduct by emerging adults (ages 18-25). Simply stated, unlike the law, neurologists resist even an 18-year cutoff for good reason. The brain does not typically reach full maturity until age 25. (Ex. H, Keating Summ., at 11-12.) A person's cognitive development is stymied, as Lee-Stinson's was, when he engaged in risky and impulsive behavior.

Jamar was not even 18 years old when the conduct occurred. At this age, he was susceptible to peer pressure and less than fully capable of regulating impulse control or risk-seeking behavior. Even his juvenile conviction for operating a stolen vehicle reflects risk-seeking behavior that is not nuanced or well-thought out.

### b. The nature of the offense

The nature of the offense is inherently serious. On November 8, 2021, Jamar entered a gas station with two other friends. While waiting to make a purchase, three men, one of them armed, enter the store. Jamar did not know the men, but for whatever reason, the armed individual displayed his gun to Jamar in a threatening manner. Jamar

---

[11] *Id.* (cleaned up).

was frightened, and displayed his gun on the counter while paying, hoping to scare away the men. Jamar then rushed himself and the others to the car.

Because the driver side door of the car was not functioning, Jamar and the driver had to enter the car from the passenger side. Jamar was the last to enter the car, and did so just before the three men were exiting the store. Jamar recalls seeing the armed man pull out and cock his gun.



Jamar and the other passenger made the impulsive—and admittedly reckless—decision to fire some shots from the car. Jamar stepped out to fire additional shots towards the armed man and his crew. Jamar then returned to the car and left.

When interviewed on Dec. 4. 2021, Jamar did cooperate by waiving his Miranda rights and admitting that he was present at the gas station when the shooting occurred.

    c. **Need for the Sentence Imposed**

        i. *To Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense*

13

A 48-month sentence would both reflect the seriousness of the offense and provide a just punishment for the offense. Jamar is not asking for probation. He understands that his conduct could have resulted in someone getting seriously hurt, or even killed. He is accepting responsibility for his risk-seeking behavior and asking the court to imprison him for 48 months. Jamar has already served nearly a year in custody, much of that time at FDC Milan. He has not been offered rehabilitative programming while there. He has not been provided with mental health counseling. The experience has been difficult, as it would be for any teenager being housed with older hardened inmates. His incarceration has caused him to feel isolated from his family and friends. Even when he has the funds to speak with family, the shame of his incarceration makes it difficult for him to do so. Jamar recognizes that this is not where he would like to spend the rest of his young adulthood.

    ii. *The need to deter.*

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[12] "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."[13] The

---

[12] Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).
[13] *Id.*; see also Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

14

Institute of Criminology at Cambridge University also confirmed the same.[14] One report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.[15] It examined the effects of changes to both the certainty and severity of punishment. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." [16]The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects."[17] Research regarding white collar offenders, in particular (presumably the most rational of potential offenders), found no difference in the deterrent effect of probation and that of imprisonment.[18] According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions."[19]

In this case, the entirety of the incident was caught on camera. Law enforcement thereafter used a facial recognition program--a relatively novel technology--to positively

---

[14] See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), available at https://www.albertalawreview.com/index.php/ALR/article/view/1415/1404.
[15] *Id.* at 1.
[16] *Id.* at 2.
[17] *Id.* at 1.
[18] See David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); see also Gabbay, supra, at 448-49 ("'[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").
[19] Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

identify Jamar as a suspect. Between the prevalence of cameras and the Orwellian technology that the Government has to identify suspects, Jamar understands that his arrest and conviction were certain. More than that, however, Jamar has realized the impact that his incarceration has had on his relationship with his family. He feels shame and disappointment, and is personally deterred from putting himself in this position again.

### i. The need for correctional treatment

As noted above, Jamar recognizes the need for intensive substance abuse rehabilitation, and the need to address the trauma that led him to using in the first place. Jamar respectfully requests that he be recommended for the Residential Drug Abuse Program, so that he may have a chance at reforming his behavior in a pro-social manner.

### 3. Conclusion

Jamar's hardships have undoubtedly impacted his decision-making ability. But over the last year, the trauma of his incarceration has forced Jamar to reevaluate his fragile livelihood. The law must "tak[e] into account the real conduct and circumstances involved in sentencing," as well as the defendant's personal history and characteristics.[20] The guidelines cannot do these things because they have no way to convert Jamar's life into a table entry. The Court must do what the guidelines cannot: "consider every convicted person as an individual and every case as a unique study in the human failings

---

[20] *Gall v. United States*, 128 S. Ct. 586, 599 (2007), 18 U.S.C. § 3553(a)(1).

that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[21] The real conduct of this offense and the facts of Jamar's life show that a sentence of not more than 48 months is appropriate.

For these reasons, Jamar Lee-Stinson asks that the Court sentence him below the low end suggested by the advisory guidelines and sentence him to not more than 48 months.

Respectfully,

/s/Daniel S. Dena
**Daniel S. Dena**
Assistant Federal Defender
Federal Community Defender -
Eastern District of Michigan
613 Abbott Street.
Detroit, Michigan 48226
313-967-5834
Texas Bar No. 24101694
Daniel_Dena@fd.org

---

[21] *Gall* at 598 (internal citation omitted).

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2022, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system that will send notification of such filing to all registered parties.

/s/ Jennifer Mellas
Paralegal
Federal Community Defender
